Per CuRiam :
This is a suit by the plaintiff as the owner and operator of two watch repair schools to recover tuition for training furnished to veterans pursuant to Public Law 16, 57 Stat. 43 and the Servicemen’s Readjustment Act of 1944, 38 U.S.C. §§ 693, et seq. (1952). Defendant denies liability for the claims made by plaintiff, and in defense alleges that plaintiff has received overpayments for tuition furnished at both these schools. Defendant has counterclaimed for the amount of these alleged overpayments. Plaintiff was indicted and pleaded guilty to a charge of having submitted false cost data to the Veterans Administration relative to the operation by him of one of his schools, and was fined $10,000 for this criminal violation. Defendant also counterclaims here for the balance still due on that fine. Defendant further alleges that plaintiff practiced or attempted to practice fraud against the United States in the presentation and allowance of his tuition payments by the Veterans Administration, and on such grounds has filed a counterclaim against plaintiff pursuant to the provisions of the False Claims Act, 31 U.S.C. 231. In conclusion defendant has filed a special plea in fraud pursuant to 28 U.S.C. 2514, requesting the forfeiture of plaintiff’s claims as set forth in his petition on the grounds that plaintiff has practiced or attempted to practice fraud against the United States.
*577 It is found on the basis of the findings which are hereinafter set forth that plaintiff has practiced or attempted to practice fraud against the United States relative to the claims set forth in the petition. Accordingly, defendant’s special plea in fraud is sustained and pursuant to 28 U.S.C. 2514 plaintiff’s claim is hereby forfeited to the United States and the petition will be dismissed.
It is further concluded that defendant is entitled to recover the sum of $142,318.95 on its second and third counterclaims for overpayment and judgment will be entered for defendant in that amount. Defendant is not entitled to recover on its first and fourth counterclaims and these counterclaims will be dismissed.
It is so ordered.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, an individual residing at 151 Honesdale Eoad, Carbondale, Pennsylvania, was the sole owner and operator of two trade schools (one located at Scranton, Pennsylvania, and the other located at Hazleton, Pennsylvania), each bearing the name of Scranton School of Watch Eepairing, hereinafter referred to as the Scranton school and the Hazleton school, respectively. The Scranton school was established in 1947 and the Hazleton school was established in 1949. These trade schools offered courses of instruction in clock and watch repairing and in jewelry repairing and stone setting. The majority of the students in the two schools were veterans of World War II.
2. This suit is brought by plaintiff to recover tuition for training furnished to veterans at both the Scranton and Hazleton schools as reflected in 21 unpaid vouchers, covering the period from July 1, 1951, through December 31. 1951. Defendant alleges that overpayments for tuition furnished at both schools were made by the Veterans Administration, in that tuition rates paid plaintiff were determined by the Veterans Administration upon overstated cost-data statements which plaintiff submitted for each of his schools and *578 upon which the Veterans Administration relied for rate-fixing purposes. Defendant has counterclaimed for the amount of the claimed overpayments which exceed plaintiff’s claim and also claims a setoff against the amount due and owing plaintiff for tuition during the period July 1, 1951, through December 31,1951. The defendant also alleges that plaintiff (1) submitted false cost-data statements for the purpose of obtaining higher tuition rates than were justified by his actual operating costs, and (2) submitted vouchers, including the unpaid vouchers, for tuition and charges for tools and supplies in amounts which plaintiff knew were false or fraudulent. By reason of such acts by plaintiff, defendant requests forfeiture of plaintiff’s claim and that the Court invoke the provisions of the False Claims Act, against plaintiff for double damages plus $2,000 for each false claim submitted.
3. Plaintiff entered into the following contracts with the Veterans Administration to furnish vocational rehabilitation to eligible veterans under Public Law 16, March 24, 1943, as amended, 57 Stat. 43, and education and training to eligible veterans under Public Law 346, June 22,1944, as amended, known as the Servicemen’s Readjustment Act of 1944, 58 Stat. 284, as follows:
1. Contract V3056V — 195 (Public Law 346) for the Scranton school, period January 1, 1949 to December 31 1949.
2. Contract V3056V-196 (Public Law 16) for the Scranton school, period January 1, 1949 to December 31 1949.
3. Contract V3056V-446 (Public Laws 16 and 346) for the Hazleton school, period June 1, 1949 to May 31, 1950.
4. Contract V3056V-522 (Public Law 346) for the Scranton school annex, period July 1, 1949 to December 31,1949.
Subsequent to the expiration date of the last formal contract entered into with the Veterans Administration, plaintiff continued to train veterans without formal contract at the same rates embodied in the last contract for each of the schools.
4. Change 4 to the Veterans Administration’s Manual M7-5, “Training Facilities,” promulgated May 17, 1948, and *579 effective July 1, 1948, required that contracts for tbe education and training of Public Law 346 veterans as well as for the vocational rehabilitation of disabled veterans under Public Law 16, negotiated with profit schools which came into existence after June 22,1954, and which had a majority of veterans enrolled, be negotiated on a fair and reasonable basis. This regulation provided, in pertinent part, as follows:
80. DETERMINATION OF FAIR AND REASONABLE COMPENSATION.
The determination of fair and reasonable compensation by the Manager, as in the case of courses of less than 30 weeks or courses of 30 weeks or more in institutions other than nonprofit? will require the submission by the educational or training institution of detailed, certified financial statements showing the most recent actual cost experience of the institution for the specific courses involved including cost data on the items of expense which will be used for the determination of fair and reasonable compensation, the basis on which teaching salaries and other expenses have been allocated to the courses involved, and the number of students enrolled, and the number of clock hours or credit hours during the period covered by the cost data. In the case of new courses for which no actual cost experience is available, estimated costs may be submitted.
*****
c. When the Manager Has Completed His Analysis of the Cost Data. When the Manager has completed his analysis of the cost data, he will determine on the basis of the total number of all students trained and cost of the items listed herein after reflecting known changes in costs whether the customary charges of the educational or training institution are fair and reasonable. In making this determination, the Manager will give consideration to the fact that it is not fair and reasonable for the VA to pay a charge based on the full cost of operating an educational institution under abnormal situations, such as periods when enrollments in the institution are far below the normal capacity and expectancy of the institution, or where operating costs are greatly in excess of normal operating costs for other comparable institutions in the same general locality. Contracts, when required, will be negotiated to provide payment not to exceed the amounts determined by the Manager to be fair and reasonable as provided herein.
*580 Under the aforementioned regulation, plaintiff was required to furnish and did submit to the Veterans Administration certified cost-data statements for the purpose of enabling the Veterans Administration to determine fair and reasonable tuition rates for courses of instruction to be given veterans at the Scranton and Hazleton schools.
On December 23, 1948, plaintiff submitted a statement which he certified to be the actual operating costs of the Scranton school for the period December 1, 1947, through November 30, 1948; and on August 5, 1949, plaintiff submitted a similar certified statement of the actual operating costs of the Hazleton school for the period January 1, 1949, through April 30, 1949.
(5. The monthly tuition rate of $62.40 incorporated in contracts V3056V-195 and V3056V-196 for the training of veterans in tho course in clock and watch repairing at the Scranton school, covering the period January 1, 1949, through December 31, 1949, determined by the Veterans Administration to be a fair and reasonable rate, was based upon the cost-data statements submitted by plaintiff for the period December 1,1947, to November 30,1948. Except for corrections and minor errors of computation, the Veterans Administration, in determining this fair and reasonable rate, accepted and utilized the costs as submitted by plaintiff. In addition, upon the plaintiff’s representation that salaries for instructors were increased during the latter portion of the time covered by the cost-data statement, and at plaintiff’s request that the increased salaries be taken into consideration for rate purposes for his teaching cost for the ensuing year, the Veterans Administration took into consideration the increased teaching costs for the entire 12-month period in computing the fair and reasonable rate, together with all of the other costs contained in plaintiff’s cost-data statement.
6. With respect to the Hazleton school, the monthly tuition rate of $36.60 for the training of veterans in the course in clock and watch repairing, which was incorporated in contract V3056V-446 covering the period June 1, 1949, through May 31, 1950, was determined to be fair and reasonable based upon the cost-data statement submitted by *581 plaintiff for the period January 1, 1949, to April 30, 1949. However, since the Hazleton school had been in operation for only a short period of time prior to the submission of the cost-data statement, and since the school had its authorized enrollment increased to a maximum of 150 students, the Veterans Administration increased all costs in the cost-data statement which would vary with the increased student enrollment so as to reflect a total enrollment of 150 students. In so doing, the variable operating costs of the school were reduced to a unit cost per student and then multiplied to reflect the overall cost for the enrollment of 150 students. The amounts of the nonvariable items, such as rent and depreciation, were taken as they appeared on the cost-data statement, since these costs would not increase with the proportional increase of student enrollment. Accordingly, on the basis of the amounts contained in the cost-data statement, the Veterans Administration, in computing a fair and reasonable tuition rate for the Hazleton school, utilized the costs in the cost-data statement increasing those costs which would normally increase with a larger student enrollment.
7. Plaintiff accepted the determination by the Veterans Administration of fair and reasonable tuition rates for the courses of instruction offered at the Scranton and Hazleton schools based upon the cost-data statements submitted for both schools. During the trial of this action, plaintiff presented no evidence challenging either the reasonableness of the tuition rates as determined by the Veterans Administration or the evidence presented by defendant establishing that the Veterans Administration relied completely on the cost-data statements submitted by plaintiff in determining the aforesaid tuition rates.
8. Under contract V3056V-522 for the period July 1,1949, to December 31,1949, plaintiff was to furnish outright to veterans such books, supplies, and equipment as were necessary to pursue and complete the course in which the veteran was enrolled. In this regard the contract provided that:
(e) The Veterans Administration will compensate the Contractor for the books, supplies, and equipment provided in this Article as follows: At cost to the institution in an amount not to exceed $49.92 as indicated by the tool list in that amount attached hereto.
*582 Accordingly, plaintiff was to be reimbursed for books, supplies, and equipment furnished to veteran enrollees at an amount equal to the cost to the plaintiff up to a maximum amount of $49.92 per student and under Veterans Administration Regulation 10539(E). Plaintiff was under an obligation to make certain that the Veterans Administration was not billed for such items at unreasonable prices.
9. In August of 1951 representatives of the Veterans Administration contacted plaintiff for the purpose of requesting the books and records of the Scranton school relating to and supporting the cost-data statement covering the period from December 1, 1947, through November 30, 1948, previously submitted by plaintiff and relied upon by the Veterans Administration in fixing a fair and reasonable tuition rate under the subject contracts, in order to enable the Veterans Administration to verify the cost-data statements against the school’s records. Plaintiff never produced these books and records.
At or about the time such books and records were requested by defendant, a special grand jury was convened in Scranton, Pennsylvania, to investigate the conduct of schools which were training veterans in the area which included plaintiff’s schools. The Scranton and Hazleton schools were among the schools investigated, and the grand jury subpoenaed the books and records of those schools. Plaintiff then produced before the grand jury all of the books and records for the Hazleton school, including those for the period January 1, 1949, to April 30, 1949, which was the same period for which the cost-data statement had been submitted by plaintiff to the Veterans Administration. Plaintiff did not produce any books and records of the Scranton school for the period December 1,1947, to November 30, 1948 (the period covered by the Scranton cost-data statement), but did produce books and records such as cash receipts, cash disbursements, fixed capital ledger, cancelled checks, bank stubs, bank statements, and invoices of suppliers for the years 1949, 1950, and 1951. Subsequently, the Veterans Administration was able to obtain all of these books and records for the purpose of verifying the accuracy of the cost-data statements utilized for rate purposes for *583 both, of plaintiff’s schools. Books and records for the Scranton school for the period from December 1947 to November 1948 were never obtained.
10. While the Veterans Administration audit was underway and as a result of the grand jury investigations, plaintiff, on February 6, 1952, was indicted on two counts, each charging plaintiff with knowingly presenting false statements of costs for the purpose and with the intent to deceive the Veterans Administration and fraudulently influence it in the exercise of its function of determining a fair and reasonable tuition rate to be paid plaintiff for the training of veterans.
The first count related to the Scranton school and referred to the plaintiff’s cost-data statement covering the period December 1, 1947, to November 30, 1948, as a false document.
The second count related to the Hazleton school, and referred to plaintiff’s cost-data statement covering the period January 1, 1949, to April 30, 1949, as a false document.[1]
Subsequently plaintiff entered a guilty plea to count 2 and, by order of the United States District Court for the Middle District of Pennsylvania, dated May 14,1953, plaintiff was sentenced to “imprisonment for a period of 18 months and to pay a fine of $10,000.” Count 1 was dismissed.
11. The Veterans Administration, being unable in August 1951 to obtain access to the boobs and records of plaintiff in order to make its audit, withheld payment of vouchers submitted by plaintiff for services rendered in July and subsequent thereto, pending the results of efforts to obtain the necessary supporting data for plaintiff’s cost-data statements and the results of any audit conducted thereafter. In view of the suspension of payments, pending the results of the audit undertaken by the Veterans Administration after obtaining plaintiff’s books and records previously produced for the grand jury, plaintiff closed his Hazleton school, in November 1951, and sought some method to continue training veterans at his Scranton school, provided the Veterans Administration would make tuition payments. Accordingly, *584 plaintiff, on January 2, 1952, selected a trustee, with the consent of the Veterans Administration, who was to operate the Scranton school for the benefit of plaintiff. The Veterans Administration authorized the trustee to bill for the instruction given to veterans in the course in clock and watch repairing and in the course in jewelry repair and stone setting, at the rates of $0,482 and $0.8419 per hour of instruction, respectively.
12> The Veterans Administration subsequently performed an audit to determine whether the cost-data statements submitted by plaintiff for each of his schools as his actual operating expenses were supported by appropriate books and records. This audit revealed that plaintiff’s books and records did not support the amounts set out in the respective cost-data statements submitted and certified to the Veterans Administration as the actual operating costs of each school for rate purposes. The Veterans Administration audit disclosed plaintiff’s cost-data statements, based upon plaintiff’s own books and records, were overstated.

Audit of the Scranton School

13. As stated above (finding 9), plaintiff never produced his books and records in support of the claimed actual expenditures made in operating his Scranton school during the period December 1, 1947, to November 30, 1948, listed in his cost-data statement. No explanation for his failure to produce the books and records appears in the record, except that plaintiff testified that he had moved and he did not know what happened to them. The Veterans Administration assembled all available school records for the years 1949,1950, and 1951. These included the school’s cash receipts, cash disbursement books, fixed capital ledger, cancelled checks, check stubs, and bank statements. The suppliers’ invoices covering the same years were also obtained. The Veterans Administration was also able to obtain reports filed by plaintiff with the Internal Revenue Service, which revealed the salaries paid by the school for the entire year 1948 and reports filed by plaintiff showing salaries paid during the last quarter of 1947. Thus the Veterans Administration was *585 able to ascertain all salaries paid by the plaintiff during the cost-data period (December 1947 through November 1948).
On the basis of these records and investigations conducted by the Veterans Administration, it was possible to audit certain of the claimed costs and reconstruct the other operating experience of the Scranton school for the period December 1947 through November 1948.
A. Salaries of Teaching and Belated. Personnel.
Since the Veterans Administration had available a report filed with the Internal Eevenue Service showing the actual salaries paid by plaintiff during the year 1948 and also had a similar report showing the salaries paid by plaintiff during the last quarter of 1947, the actual expenditures under this item were verified from these reliable sources. Of the $84,552.50 claimed in the cost-data statement, the Veterans Administration verified that only $26,017.41 was actually paid by plaintiff.
B. Oonswmable Supplies.
The Veterans Administration auditors were able to ascertain from the school’s cash disbursement records for the years 1949, 1950, and 1951 the names of the suppliers from whom plaintiff made purchases for the school. These suppliers were contacted and furnished defendant a list of the purchases made by the school during the cost-data period. Based on this information, the Veterans Administration determined that the Scranton school expended only $6,626.27 for this item instead of $28,871.71 claimed by plaintiff in the cost-data statement.
In reviewing plaintiff’s claimed expenditures for consumable supplies, irregularities were revealed indicating that, during the cost-data period, plaintiff signed checks for cash which he endorsed and which were shown on the books as having been paid to suppliers who were fictitious or nonexistent.
C. Depredation.
With respect to this item, the Veterans Administration auditors used the same base as plaintiff in computing the depreciation during the cost-data period. However, the plaintiff depreciated all equipment for the full 12-month *586 period of tlie cost-data statement regardless of when the equipment was purchased or how long it was on hand or used. The Veterans Administration allowed depreciation only for the number of months during which the equipment was on hand as being an expense during the cost-data period. Of the $2,604.70 claimed for depreciation in plaintiff’s cost-data statement only $1,433.83 was determined to be a proper depreciation expense.
D. Building Operation and Maintenance.
The only amounts which could be verified under this item were the expenditures for electric light and janitor service. The amount paid by plaintiff for janitor service was ascertained from unemployment compensation and social security records. Of the total $3,767.77 claimed in the cost-data statement, only $3,504.57 was verified as actually expended.
E. Taxes and Insurance.
This item in plaintiff’s cost-data statement indicated that social security tax was paid on the total amount of salaries paid. The amounts of the salaries were verified by the Veterans Administration from Internal Revenue records covering the years 1947 and 1948. However, the Veterans Administration recomputed the social security taxes by applying the tax on the maximum statutory limit of each salary. Plaintiff’s claim for social security taxes computed on the amount of each salary in excess of the statutory limit was properly rejected. Plaintiff’s claimed cost for social security tax was $2,428, which, when adjusted in accordance with the proper application to maximum salary taxed, was reduced to an allowance of only $946.13. Insurance expense claimed in the amount of $159 was substantially verified as correct.
P. Advertising Gosts.
The amount claimed under this item in the cost-data statement could not be verified.
In summary, it has been shown that of the total sum of $111,102 claimed by plaintiff in his certified cost-data statement as representing the actual operating costs of the Scranton school during the period from December 1947 *587 through. November 30, 1948, the amount of $41,107.45 was actually the correct operating cost experience during that period.

Audit of the Hazleton School

14. In making this audit, the Veterans Administration utilized the books and records of plaintiff covering the cost-data period from January 1, 1949, to April 30, 1949, and had plaintiff’s books and records showing that school’s expenses for the entire year 1949. In addition, the auditors examined the school’s cash receipts and cash disbursements journal, payroll book, a fixed capital ledger, cancelled checks, cheek stubs, vendors’ receipts, and bank statements.
Plaintiff’s certified statement of actual operating costs totalled $18,107.57. As a result of the audit, the Veterans Administration verified a total of $7,348.49 as the actual expenditures made in the 4-month period covered by the cost-data statement. Additionally, the Veterans Administration ascertained that the total expenditures for operating the Hazleton school for the entire year 1949, as reflected by the school’s books and records, amounted to $20,880. Specifically, the audit showed overstatements in the cost-data statement submitted by plaintiff in various items as follows:
A. Teaching Salaries.
Plaintiff claimed $6,762 as having been expended for teaching and related personnel salaries during the 4-month period of the cost-data statement, whereas the audit revealed that only $2,469 was actually expended for this item during the same period.
B. Consumable Supplies awl Tools.
Plaintiff claimed $4,050.04 for consumable supplies, whereas the audit revealed that only $1,581.51 was actually expended under this heading. This represented the total cost of consumable supplies purchased by the school, and, since the Veterans Administration did not have plaintiff’s closing inventory record for the period of the cost-data statement, it was impossible to determine what amount of the total consumable supplies purchased were actually used by the school during the period and therefore properly charge *588 able as an item of cost. By allowing the total expenditure of $1,581.51 for this item, the Veterans Administration was, in effect, assuming that all purchases were consumed during the period, a decision favorable to plaintiff.
With respect to consumable tools, plaintiff claimed $1,461.54 as having been expended, but only $56.73 was verified as actually spent during the cost-data period involved.
C. Depreciation.
With regard to depreciation, it was discovered during the audit that plaintiff, in preparing the cost-data statement, had depreciated all capital goods purchased during the cost-data period without regard to the time of acquisition, at a rate of 20 percent for the whole period. In so doing, plaintiff failed to show that some of the depreciable property was purchased near the end of the cost-data period. In determ-ing the true amount of depreciation the Veterans Administration used the same rate, 20 percent, as plaintiff, but computed the rate of depreciation only from the date each item was purchased. It was necessary, however, for the Veterans Administration to make an adjustment in the base to which the depreciation rate was applied, because plaintiff overstated the amount expended for capital goods purchased. Plaintiff listed an expenditure of $7,031 for this item in the cost-data statement, whereas the audit revealed that only $2,429 was actually expended for capital goods. Therefore, the Veterans Administration allowed only $143.49 as the proper amount of depreciation, instead of $468.64 claimed by plaintiff in the cost-data statement.
D. Bent and Amortisation of Leasehold Improvements.
The audit revealed that the amount of $400 claimed by plaintiff for rent in the cost-data statement was actually expended. However, plaintiff claimed amortization of $676.26 for one year for leasehold improvement expenditures during the cost-data period. Since it was ascertained that these improvements would last for at least 3 years, the Veterans Administration spread the amortization of $676.26 over a 3-year period and considered $74.56 as the proper amortization allowance for the cost period.
*589 E. Heat, Light and Janitor Service.
The amount of $830.19 was claimed in the cost-data statement for this item, but only $158.83 was -verified as actually expended during the cost-data period. The largest amount claimed under this item was $595 for the janitorial services of one Philip L. Dominic. The Veterans Administration discovered that no such person was ever employed by the Hazleton school, nor did the books and records of the school show that any payments were made to any such person during the cost-data period.
P. Taxes, Insurance, and License Fee.
Plaintiff claimed $306.48 in the cost-data statement for this item, but only $237.23 was verified as actually expended during the cost-data period.
G. Administrative Expense.
' Plaintiff claimed $2,282.09 in the cost-data statement for this item, but only $1,361.67 was verified as actually expended during the cost-data period.
H. Advertising.
Plaintiff claimed $869.37 in the cost-data statement for this item and $864.67 was verified as actually expended during the cost-data period.
In sum, the actual operating expenses verified by audit of plaintiff’s own books and records totalled $7,348.49 as against the $18,107.57 which plaintiff represented as his actual operating expenses from January 1, 1949, through April 30,1949.
15. Subsequently, on the basis of the respective actual operating expenses of the Scranton and Hazleton schools as uncovered by the audits referred to above, the Regional Office of the Veterans Administration redetermined the tuition rates for the courses in clock and watch repairing offered to veterans in these schools. The redetermined rate for the Scranton school was $18.66 per student month and for the Hazleton school the rate was $27 per student month. These redetermined rates did not become effective until approved by the Veterans Administration’s Central Office. Accordingly, the Eegional Office forwarded its redetermina-tions to the Washington, D.C., Central Office for approval. *590 Upon review of tbe Regional Office’s recommended redetermined tuition rates, the Central Office of the Veterans Administration returned the redetermination and recommended that certain items of cost, for which no verification in the audit could be ascertained, be included and taken into consideration in making a new computation of the rate. Items recommended to be added by the Central Office related to costs which any school would necessarily incur in the normal course of operations. By increasing the verified costs, the Veterans Administration was taking into consideration expenditures for which the school was unable to supply supporting records.
Upon receipt by the Regional Office of the Central Office’s observations and instructions with respect to redetermining the tuition rates for both schools, the Veterans Administration Regional Office redetermined the fair and reasonable tuition rate for the courses in clock and watch repairing for the period of contracts V3056V-195 and V3056V-196 at $23.40 per month for the Scranton school and $30.25 for the period of contract V3056V-446 for the Hazleton school, which rates were approved by the Veterans Administration’s Central Office and became the fair and reasonable rates for the periods pertinent to this action.
16. By reason of the aforementioned redetermination of the tuition rates for the courses in clock and watch repairing under the respective contracts with the Scranton and Hazleton schools, it was determined that the Veterans Administration had paid plaintiff the sum of $127,038.01 for tuition over and above the amount plaintiff was entitled to receive for the training of veterans at the Scranton school from January 1,1949, to June 30,1951, and that it had paid plaintiff the sum of $7,002.38 over and above the amount to which plaintiff was entitled during the period June 1, 1949, to June 30, 1951, for the training of veterans at the Hazle-ton school.
In addition, during the period when the Scranton school was operated by a trustee for the benefit of plaintiff, it was determined that the Veterans Administration paid the trustee the sum of $6,748.55 over and above the amounts he *591 was entitled to receive for the period January 1, 1952, to September 15,1952, based upon the redetermined rate.
Accordingly, the total amount of overpayments made by the Veterans Administration for tuition at both the Scranton and Hazleton schools is $140,788.94.
17. With respect to the Scranton school annex, plaintiff entered into the aforementioned contract V3056V-522 with the Veterans Administration which provided, in part, that plaintiff would be compensated for books, tools, supplies, and equipment furnished to veterans, at a cost to the school not to exceed the amount of $49.92, as indicated by the tool list attached to said contract. An audit was performed on the books and records by ascertaining the cost to the school for the tools issued to individual veterans and checking the veterans’ receipts for tools received. Based upon this audit, it was determined that plaintiff paid his suppliers $3,459.77 and billed the Government for tools used by veterans in the amount of $4,446.36, which represents an overcharge of $986.59 for tools and supplies. In addition, it was discovered that plaintiff began his purchases with Hamel Eiglander and Company, but later switched to the Mayer Beck Company which charged 50 percent more for the same tools purchased from Hamel Eiglander. However, Mayer Beck purchased the tools from Hamel Eiglander at the same price which Hamel Eiglander had charged plaintiff. Forty-two sets of tools were purchased from Mayer Beck at a 50 percent higher price than said tools could have been purchased by plaintiff directly from Hamel Eiglander. This represented an overcharge to the Government of $543.42 thereby increasing the total overcharge for tools under this contract to $1,530.01.
18. Plaintiff produced no evidence whatsoever to controvert the results of the aforementioned audits, the redetermi-nation of tuition rates, or the computation of overpayments made to both schools as a result of the redetermined rates. Plaintiff did not introduce any evidence challenging the aforementioned overcharges for tools and supplies under contract V3056V-522.
19. During the pertinent period involved under the aforementioned contracts and thereafter, when plaintiff billed the Government at the tuition rates specified in the last contract, plaintiff submitted 81 vouchers aggregating $201,914.65 with *592 respect to the training of veterans at his Scranton school and 72 vouchers aggregating $40,359.06 with respect to said training at the Hazleton school, all of which were paid by the Veterans Administration. In addition, plaintiff submitted 12 vouchers for the training of veterans at the Scranton school in the aggregate amount of $37,431.69 and nine vouchers for similar training at the Hazleton school in the aggregate amount of $6,891.60, all of which remain unpaid and form the basis of plaintiff’s claim in this action.
20. With respect to the $10,000 fine imposed upon plaintiff as a result of the guilty plea entered by him to count 2 of the aforementioned grand jury indictment for knowingly and willfully submitting false cost-data statements to the Veterans Administration, in violation of 18 U.S.C. 1001, plaintiff failed to pay this fine and the United States garnisheed funds in the hands of a debtor of plaintiff in an effort to obtain satisfaction of the fine. As of July 21, 1960, the sum of $6,300 had been collected by the defendant, and the sum of $3,700 remained due and unpaid.[2]
21. There is substantial evidence to support a finding that plaintiff has been paid a total of $142,318.95 over and above what plaintiff was entitled to receive.
22. In attempting to establish the claim, no witness other than plaintiff Mitchell appeared. He testified on direct examination with respect to his claims for training veterans in both of the schools. After answering a few questions on cross-examination with respect to matters relating to the operations of his schools, he refused to answer any further questions propounded by counsel for defendant with respect to the cost-data statement submitted by him relating to the actual operating costs of the Scranton school.[3]
*593 23. Plaintiff’s claim is based upon 21 unpaid vouchers for the period July 1, 1951, to December 31, 1951, totalling $44,323.59. This amount represents charges based upon tuition rates which originally were fixed by the Veterans Administration upon cost-data statements submitted by plaintiff. Based upon the rates as redetermined by the Veterans Administration and noted on each voucher, the amount of the vouchers would be reduced to $28,624.
Nine of the vouchers upon which plaintiff is suing seek payment for services rendered to veterans at his Hazleton school, and the record shows that plaintiff pleaded guilty to the commission of fraud against the United States with respect to the Hazleton school.
24. Based upon a review of the record, it is found that plaintiff practiced or attempted to practice fraud against the United States under 28 U.S.C. 2514 in connection with claims submitted to the Veterans Administration concerning operating costs.
CONCLUSIONS OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff corruptly practiced or attempted to practice fraud against the United States relative to the claims contained in the petition. Accordingly, the defendant’s special plea in fraud is sustained, plaintiff’s claim is declared forfeited to the United States pursuant to 28 U.S.C. 2514, and the petition is dismissed.
It is further concluded that defendant is entitled to recover on its second and third counterclaims and it is therefore adjudged and ordered that defendant recover of and from the plaintiff the sum of one hundred forty-two thousand three hundred eighteen dollars and ninety-five cents ($142,318.95). It is further found that defendant is not entitled to recover on its first and fourth counterclaims and these counterclaims are dismissed.

 This count refers to one of the periods and a cost-data statement involved in this litigation.

 Proof was left open at tlie close of the trial for the purpose of allowing defendant to present later information concerning payment of the fine. By letter dated July 21, I960, defendant notified the Commissioner that ¡¡¡6,300 of the fine had been collected.

 There came a time during the cross-examination of plaintiff Mitchell when he declined to answer questions, stating, “I plead the fifth amendment” (Tr. 61, 62). At page 69 of the transcript we find this statement in response to a question: “I decline to answer on the grounds that it may tend to incriminate me.” Again, on page 74, he responded to another question concerning the Scranton school by stating: “I decline to answer that on the ground that it might incriminate me.”